Jacques J. CREPPEL et al.

v.

The UNITED STATES ARMY CORPS OF ENGINEERS et al.

Civ. A. No. 77–25.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Aug. 8, 1980.

Joseph E. LeBlanc, Jr., Richard A. Fraser, III, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for plaintiffs.

Harold L. Molaison, Gretna, La., for plaintiffs, Molaison and Samuel.

Robert L. Boese, Asst. U. S. Atty., New Orleans, La., for the United States.

Bruce M. Chadwick, Arnold & Porter, Washington, D.C., Steven Lemoine, New Orleans, La., for Wildlife Federations.

## REASONS FOR RULING

MITCHELL, District Judge.

The parties herein have filed cross motions for summary judgment. Plaintiff landowners are seeking to have the Court

set aside the agency order of Brigadier General Drake Wilson of November 16, 1976 as invalid and ordering the defendant United States Army Corps of Engineers to authorize the immediate construction of the Harvey Canal–Bayou Barataria Project as originally proposed in 1963. The federal defendants are seeking to have the Court uphold the Wilson order. An amicus curiae brief was filed by several conservation, environmental, recreational and civic organizations supporting the affirmation of the Wilson order.

The Harvey Canal–Bayou Barataria Levee Project (hereinafter the "Project") was approved as a small flood control project pursuant to Section 205 of the Flood Control Act of 1948, as amended, Public Law 87–874, 33 U.S.C. § 701s, by the United States Army Corps of Engineers (hereinafter the "Corps") on January 22, 1964. The Corps is authorized, under the small flood control statute, to spend up to one million dollars ($1,000,000) on authorized works. All costs above that amount are required to be assumed and guaranteed by the local governing body, Jefferson Parish (hereinafter the "Parish").

This Project involved an 11,700–acre tract located near the headwaters of the Barataria Bay system. This area was unleveed and undrained prior to the initiation of the Project. Part of this area is a 3,700–acre tract in which the plaintiffs have an interest and which is predominately a freshwater system consisting mainly of swamp and some marsh. This 3,700–acre tract is the area which is at issue herein. The Corps found the tract was subject to flooding from normal high, storm and hurricane tides of the Gulf of Mexico through Barataria Bay, Barataria Bay Waterway and the Gulf Intracoastal Waterway. See "Review of Reports, Harvey Canal–Bayou Barataria Levee, La., Sept. 20, 1963."

The Project was planned to be constructed in two phases. Phase I entailed excavation of material from the bottom of the Harvey Canal and Bayou Barataria, and placement of the material along the bank to form the levee system. Phase I construction was begun on September 22, 1971 and was completed on November 24, 1973. The authorized federal expenditure of one million dollars was exhausted in the construction of Phase I.

Phase II of the Project consisted of adding additional embankment material where needed and of shaping the first lift embankment material to form the final levee section. It also provided for the closure of Bayou Aux Carpes, Bayou Des Familles and the Natural Gas Pipeline Canal and for the construction of a pumping station at Bayou Aux Carpes which would drain the swamp and marsh land located behind the levees.

It was initially contemplated that the Project would provide flood protection and land reclamation benefits in the area. The land reclamation would be achieved through the drainage of wetlands by the Bayou Aux Carpes pumping station.

The Corps was required to obtain the following local assurances of cooperation from Jefferson Parish prior to commencement of the Project:

(a) Provide without cost to the United States all land, easements and rights–of–way necessary for construction of the Project, including necessary modifications and/or relocation of existing facilities;

(b) Hold and save the United States free from damages due to construction works;

(c) Construct an additional pumping station with an initial capacity of not less than 154 c.f.s. as provided in the plan of improvement and future extensions to pumping capacities as may be necessary for development of the area; and

(d) Maintain and operate all works after completion in accordance with the regulations prescribed by the Secretary of the Army.

Jefferson Parish executed the formal act of assurances, furnishing to the Corps the required agreements, on July 20, 1967. The Parish obtained the necessary rights–of–way and servitudes for the purpose of constructing, maintaining and operating the Project.

An Environmental Impact Statement was prepared and filed with the Council on Environmental Quality on November 14, 1970.

During Phase I construction Congress passed the Federal Water Pollution Control Act Amendments of 1972, Section 301 of which provides that the discharge of dredged or fill material into navigable waterways without obtaining a permit under Section 404 of the Act is unlawful. The Corps promulgated regulations implementing Section 404 on July 22, 1974.

Commencement of Phase II of the Project was authorized in March, 1974. The closure of Bayou Aux Carpes was completed in July, 1974 and on August 10, 1974 the Parish let a contract for the construction of the pumping station to Southbend Contractors, Inc. However, the Corps requested that the Parish cease further construction to allow the Corps to conduct a Section 404 review of the remaining "fill" portions of the Project.

A public hearing was conducted by the Corps on January 7, 1975 to provide interested parties the opportunity to present their views on the remaining work to be done. It was the first Section 404 hearing conducted in the New Orleans area and both positive and negative comments were received. The parties owning land in the area supported the land reclamation aspects of the Project. Many environmental and civic groups opposed the construction of the pumping station since it would result in the destruction of the wetlands in the area.

Colonel E. R. Heiberg, the New Orleans District Engineer, conducted the hearing and issued a Statement of Findings (SOF) on March 26, 1975. He found the principal adverse environmental effects would occur with the closure of Bayou Aux Carpes and the construction of the pumping station which, in combination with the levee system, would result in the loss of the wetland fish and wildlife habitat within the Project area. Colonel Heiberg determined, however, that the comments made in opposition to the Project were directed to the Project as a whole rather than specifically to the dredge and fill work remaining to be done.

He concluded that despite the adverse environmental effects, the total public interest would be served by the construction of the Project.

The Environmental Protection Agency (hereinafter "EPA"), in a letter dated April 25, 1975, objected to the Project as originally designed after reviewing the proposal and Heiberg's SOF. The EPA found that the permanent blockage of the bayous and the drainage of the interior would result in the irretrievable loss of valuable wetlands, having an unacceptable adverse impact on wildlife and recreational areas and would not be in the public interest. The EPA suggested that if a pumping station was required to augment natural drainage, it should be maintained so as to preserve the integrity of the wetlands. In light of the EPA objections the matter was forwarded to the Division Engineer for further evaluation and discussions. EPA continued to object to the destruction of the wetlands.

Brigadier General Kenneth McIntyre of the Corps wrote the EPA in October, 1975 stating his decision that it was in the public interest to have the project completed as originally authorized. He rejected the EPA's proposal that movable floodgates be substituted for the pumping station to preserve the wetlands because it would eliminate the land reclamation benefits. General McIntyre did recognize that "if the project was being formulated today (October, 1975) that an entirely different approach might be taken."

A group of scientists conducted a study of the area in March, 1976 for EPA and they found the 3,700–acre tract of wetlands to be "a valuable and viable parcel of swamp and marsh area." They continued to recommend the use of floodgates as opposed to a pumping station.

Despite these findings, on July 30, 1976, Colonel Early J. Rush, District Engineer, issued a Revised Statement of Findings reaffirming the previous SOF's. Brigadier General Drake Wilson wrote the Director of EPA in Washington, D. C. on August 27, 1976 advising her that he felt it was in the public interest to proceed with the Project

as originally authorized. He stated he would direct Jefferson Parish to resume construction within fifteen days, " *unless, within that time, we hear from you that you intend to invoke your authorities under Section 404(c)."* The EPA wrote General Wilson on September 10, 1976 asking that the Corps take no action regarding the resumption of the project pending a further review of the matter.

General Wilson visited the Project site on October 7, 1976 along with Parish representatives, EPA staff members, property owners and environmentalists. Following that inspection Wilson issued a Revised SOF which adopted the alternative plan recommended by EPA. He determined that the flood control benefits could be achieved and the requirements of Section 404 satisfied if:

(a) the flood control dikes along Bayou Barataria were completed to their project design elevation and were maintained by Jefferson Parish;

(b) the earthen dikes closing Bayou Aux Carpes and Bayou Des Familles were to be removed and replaced with movable floodgates to restore and maintain normal water flows; and

(c) the proposed pumping station is no longer required.

On January 12, 1979 in a proceeding entitled *Creppel et al. v. The Parish of Jefferson, et al.,* number 199–345 on the docket of the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana, a judgment was rendered enjoining the Parish from expending funds which originated from the bond issue election conducted by the Parish of Jefferson and Consolidated Drainage District No. 1 on April 29, 1967 for any purpose other than that included within the original project, including the construction of a pumping station at Bayou Aux Carpes. The defendants were ordered to proceed with the construction of the station. The Louisiana Court of Appeals for the Fourth Circuit affirmed the judgment on May 15, 1980.

## APPLICABILITY OF SECTION 404 TO THE PROJECT

Plaintiffs contend the Corps improperly relied on Section 404 of the Federal Water Pollution Control Act (hereinafter "FWPCA"), 33 U.S.C. § 1251 et seq., as a basis for abandoning the overall project purposes.

■ The Congressional objective in amending the FWPCA in 1972, was "to restore and maintain the chemical, physical and biological integrity of the nation's waters, to eliminate the discharge of pollutants into navigable waters, and to improve water quality, to insure the protection and propagation of fish, shellfish and wildlife and to provide for recreational use. In order to effectuate this policy the regulations under the FWPCA should extend the Corps jurisdiction to the maximum extent constitutionally possible." *United States v. Fleming Plantation,* 12 ERC 1705 (1978).

Section 313 of the FWPCA requires each agency of the federal government engaging in activities which may result in the discharge or runoff of pollutants to comply with all federal and local requirements respecting the control and abatement of water pollution to the same extent as any person subject to such requirements. The Secretary of the Army, acting through the Chief of Engineers pursuant to Section 404, is authorized to issue permits after notice and an opportunity to have a public hearing is given to allow public comment on the dredge and fill activities. The Corps is required to act in conjunction with the Administrator of EPA in determining the propriety of the disposal activity. The EPA Administrator can prohibit or restrict the use of any defined area as a disposal site whenever he determines that the discharge will have an unacceptable adverse effect on municipal water supplies, shellfish beds, fishing, wildlife or recreational areas. 33 CFR 209.145 et seq.; 40 CFR 230 et seq.

A Section 404 permit has been required where a project has been approved or begun prior to the passage of the FWPCA amendments and/or regulations implementing the same. *Scenic Hudson Preservation Confer-*

ence v. Callaway, 370 F.Supp. 162 (SDN.Y.–1973) aff'd 499 F.2d 127 (CA2–1974); Cooper v. Wisdom, 440 F.Supp. 1027 (SDFla.–1977); Conservation Council of N.C. v. Constanza, 398 F.Supp. 653 (EDN.C.–1975); Save Our Fisheries v. Callaway, 387 F.Supp. 292 (R.I.–1974); U. S. v. Fleming Plantation, supra.

■ Plaintiffs contend the holdings in cases under the National Environmental Policy Act (hereinafter "NEPA") are analogous to Section 404 cases and rely on the holding in several NEPA cases where the provisions of the Act were not applied to a partially completed project. Ragland v. Mueller, 460 F.2d 1196 (CA5–1972); Pizitz Inc. v. Volpe, 467 F.2d 208 (CA5–1972). We agree with plaintiffs' assertion that in considering the application of NEPA or Section 404 to a project, the extent to which the project is completed is a factor to be weighed by the Court. Sierra Club v. Callaway, supra. The Supreme Court in a footnote in Tennessee Valley Association v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) noted that at some point in the life of a project an agency no longer has the opportunity to weigh the benefits of the project versus the detrimental effects on the environment. In the same footnote, the Supreme Court also recognized that agencies have been required to file an EIS under NEPA where the remaining governmental action would be environmentally significant, citing: Environmental Defense Fund v. T.V.A., 468 F.2d 1164 (CA6–1972); also see Environmental Defense Fund v. Corps, 325 F.Supp. 728 (EDArk.–1971). The wetlands at issue herein have not been affected by the work previously done and they will remain undisturbed if the project is completed as modified.

■ This Court finds that the Corps was required to conduct a Section 404 review of the Project.

Plaintiffs argue that even if the review was proper the objections made were not directed to the "fill" related aspects of the Project and therefore there was no basis for refusing the 404 permit. The District and Division Engineers in their preliminary SOF's determined that the objections made to the project were not specifically aimed at the remaining fill activities and therefore were not a basis for denying the permit. The EPA and General Wilson disagreed with the earlier findings and gave a broader interpretation to Section 404, treating it as an environmental protection statute.

■ An agency's interpretation of its own regulations must be accorded great weight. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The ultimate criteria is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation. The Court must consider the language of the regulation and the stated purpose behind the rule, in determining whether or not the agency's interpretation was plainly erroneous. Udall v. Tallman, supra; Gulf Power Co. v. EPA, 11 ERC 1865 (1978).

Title 33 CFR 209.145, implementing Section 404, provides that " 'wetlands' are environmentally vital areas, which constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest."

The EPA has the authority under Section 404 to object to the placement of fill in the pipeline canal. Without the closure of the canal in addition to the construction of the pumping station the full land reclamation benefits would be eliminated. General Wilson pointed out that these two aspects of the Project were always jointly considered as the means of obtaining the drainage of the tract.

■ We find that the closure of the pipeline canal with fill in conjunction with the construction of the pumping station will result in the destruction of a 3,700–acre tract of wetlands and that General Wilson and the EPA's interpretation of the scope of a Section 404 review was reasonable and consistent with the Congressional purpose in enacting the FWPCA amendments.

Plaintiffs further contend that the only valid evaluation of the Project is the SOF's given by the District and Division Engineers and that the Corps is required to grant the 404 permit based on their preliminary findings. The regulations implementing Section 404 indicate otherwise. 33 CFR 209.145(e)2 provides a District or Division Engineer has no authority to undertake federal projects involving disposal of materials into navigable waters when the Regional Administrator of EPA has advised of his intent to take measures necessary to prohibit or restrict the use of a specified disposal site in navigable waters. Such matters are forwarded to the Chief of Engineers for further discussion and resolution. The finality of General Wilson's decision in August, 1976 was conditioned on the EPA not invoking its authority to object under Section 404. His final decision was the order of November 16, 1976.

■ An agency is not absolutely bound by its prior determinations but rather may adjust its policies and rulings in light of its experience. *Montana Power Co. v. EPA*, 608 F.2d 334, 13 ERC 1385 (1979); *Gulf Power Co. v. EPA, supra.* As stated above, the 404 hearing held in New Orleans in January, 1975 was the first of that type held in the area. The Corps was still in the process of formulating its policy under the statute. In *Gulf Power Co. v. EPA, supra,* the Court held that the EPA was not irrevocably bound by the prior determinations of one of its regional officers.

■ We reject plaintiffs' argument that the Corps was bound by the determinations made in the preliminary SOF's.

## COPRS' DUTY UNDER 33 U.S.C. § 701

Plaintiffs contend the Corps is abandoning the Project and that it has no authority to do so under certain sections of 33 U.S.C. § 701 et seq.

Plaintiffs argue that at the time the Project was initially authorized the Corps made a specific finding, pursuant to 33 U.S.C. § 701a, that the benefits of the Project exceeded its costs. Plaintiffs contend that in light of the Wilson order of November, 1976 all benefits which were the justification for the Project will be lost.

Congress in enacting 33 U.S.C. § 701 et seq. recognized that the effect of destructive flooding was a menace to the national welfare and determined that the federal government should participate in the improvement of navigable waters or their tributaries for flood control purposes if the benefits to whomsoever may accrue are in excess of the estimated costs and if lives and social security of people are otherwise adversely affected. 33 U.S.C. § 701a.

■ Prior to the enactment of the Administrative Procedure Act, 5 U.S.C. § 701 et seq., the Supreme Court, in *Oklahoma v. Guy F. Atkinson Co.*, 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941), held that 33 U.S.C. § 701(a) created no right to a judicial review of an agency's cost–benefit analysis of a project. In subsequent cases, courts have held that Section 701(a) does not authorize a continuing evaluation of the agency's action and have rejected attacks on the Corps cost–benefit analysis. *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123 (CA5–1974); *Environmental Defense Fund v. Froehlke*, 473 F.2d 346 (CA8–1972). However, there is a judicially recognized right to a review of an EIS made under NEPA wherein the Court is required to reappraise the costs and benefits of a project in light of the policies of environmental protection found in NEPA. *Sierra Club v. Callaway*, 499 F.2d 982 (CA5–1974); *Environmental Defense Fund v. Froehlke, supra.* An agency decision on a project may be reversed where the balance of costs and benefits that was struck was arbitrary and capricious and clearly gave insufficient weight to environmental values. *Montgomery v. Ellis*, 364 F.Supp. 517 (NDAla.–1973). Plaintiffs have not requested a review of the EIS on the Project. However, in reviewing the agency order herein this Court feels compelled to take into account the costs and benefits of the Project, which must include an evaluation of its environmental impact. In an amendment to the Flood Control Act, 33 U.S.C. §§ 701b–11(a)

passed in 1974, Congress stated that in formulating flood control plans federal agencies should employ the most economically, socially and *environmentally* acceptable means of reducing or preventing flood damages. The Corps also has an affirmative duty under the Rivers and Harbors Act, 33 U.S.C. § 403, as well as under Section 404, in authorizing any project involving dredging and filling in navigable waters, to act so as to preserve the environment by considering ecological factors. *U. S. v. Moretti,* 526 F.2d 1306 (CA5–1976); *Zabel v. Tabb,* 430 F.2d 199 (CA5–1970).

 We cannot agree with plaintiffs' assertion that we must restrict our review of the agency's decision to the terms of the Project's costs and benefits at its inception in the early 1960's without taking into account the Congressional policies expressed in subsequent environmental legislation. This Court declines to overturn the agency decision on the basis of a violation of 33 U.S.C. § 701a.

Plaintiffs also argue that the Wilson order is invalid because the Corps did not obtain binding assurances of cooperation from Jefferson Parish as required by 33 U.S.C. §§ 701s and 701c.

In *Akers v. Resor,* 339 F.Supp. 1375 (WDTenn.–1972), the Court found that Section 701c in providing "there must be assurances satisfactory to the Secretary of the Army" commits the decision of acceptance of assurances to agency discretion and therefore there was no specific law to apply which prohibits the Court from reviewing the matter. 5 U.S.C. § 701.

Plaintiffs rely on the case of *Concerned Residents of Buck Hills Falls v. Grant,* 537 F.2d 29 (CA3–1976) for the proposition that the acceptability of assurances given is judicially reviewable. The *Buck Hills* case involved an interpretation of Section 80(b) of the Water Resources Act rather than 33 U.S.C. § 701c. Section 80(b) provides that the "Corps may use an alternative interest rate in calculating a project cost, where the non–federal interests have given satisfactory assurances to pay the required non–federal cost."

In *State of Alabama ex rel. Baxley v. Corps of Engineers,* 411 F.Supp. 1261 (NDAla.–1976), the Court compared the language of 80(b) and 701c and found that 701c required that the assurances given thereunder had to be given to a specified public official for a subjective determination and therefore it was a judgment committed to agency discretion by law which was not subject to judicial review. In contrast, the language of 80(b) with regard to providing satisfactory assurances is used in a general non–specific sense and vests no particular public official with the authority to make a determination of precisely what degree of assurance is required in order to be considered satisfactory. "Thus the phrase is to be tested by an objective standard rather than a subjective standard of a particular public official and is judicially reviewable." We agree with this rationale and find the *Buck Hills* case to be distinguishable from this one.

 See also *United States v. City of Irving, Texas,* 482 F.Supp. 393 (NDTex.–1979) wherein the Court declined to allow the city of Dallas to bring an action under 701c, finding that the United States alone is entitled to sue for alleged 701c violations since its provisions envision ongoing federal oversight and enforcement. We find that the plaintiffs have no standing to sue on the basis of the Corps failing to get adequate assurances of cooperation.

 However, we note that the Jefferson Parish officials orally agreed to proceed with the Project as modified.

## VALIDITY OF THE AGENCY DECISION

Plaintiffs contend that the Wilson order of November 16, 1976 is arbitrary and capricious and is not supported by the administrative record.

 A reviewing court may set aside an agency decision that is arbitrary and capricious or an abuse of discretion. 5 U.S.C. § 706. It is not, however, the Court's province to substitute its judgment

for that of the agency to which is committed the interpretation of a statute or regulation. *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Taylor v. Dt. Eng. U.S. Army Corps,* 567 F.2d 1332 (CA5–1978). If an administrative decision of the Corps is a reasonably well founded application and construction of its regulations, its decision must be upheld. *Kinnett Dairies v. Farrow,* 580 F.2d 1260 (CA5–1978); *U. S. v. Fleming Plantation, supra.* Information extraneous to the record should not be considered in the review procedure. If agency action is found to be improper, it should be remanded to the agency. *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Gables by the Sea, Inc. v. Lee,* 365 F.Supp. 826 (SDFla.–1973), aff'd 498 F.2d 1340 (CA5–1974).

Plaintiffs contend Wilson's decision was made merely as "an accommodation" to the Parish and not on the basis of the administrative record.

 It was the responsibility of the Parish to complete the Project under the direction of the Corps. It appears to the Court that General Wilson's discussion with the Parish officials was merely to obtain their viewpoint on the Project in light of the environmental objections. We find that this discussion was a legitimate part of Wilson's decisionmaking process and that it was not the sole basis for his decision of November 16, 1976.

Plaintiffs contend that the Wilson order results in the abandonment of the Project and a total waste of the expenditures made.

 The Flood Control Act placed the responsibility for *flood control* projects under the direction of the Secretary of the Army and the supervision of the Chief of the Engineers. 33 U.S.C. § 701a–1. Plaintiffs are correct in their assertion that the Corps may authorize a project with benefits in addition to flood control. *State of Oklahoma v. Atkinson, supra.* However, the Corps has the authority to modify a project as it progresses and it is not an abuse of discretion to alter the original project where flood control purposes continue to be served. *United States v. Sponenbarger,* 308 U.S. 256, 60 S.Ct. 225, 84 L.Ed. 230 (1939); *United States v. 2,606.84 Acres of Land in Tarrant Co., Tex.,* 432 F.2d 1286 (CA5–1970).

General Wilson in evaluating the Project was required to consider the regulations implementing Section 404. In doing so he had to consider the 3,700–acre tract of wetlands, as "environmentally vital areas . . . ."

In regard to wetlands 33 CFR 209.145 provides:

Although a particular alteration of wetlands may constitute a minor change, the cumulative effect of numerous such piecemeal changes often results in a major impairment of wetland resources. Thus any wetlands site involved in a federal project will be evaluated with the recognition that it is part of a complete and interrelated wetland area . . . . Disposal of dredged materials will not be performed in wetlands identified as important, unless . . . the benefits of the proposed disposal outweigh the damage to the wetlands resources and the proposed disposal is necessary to realize the benefits.

The record does not support plaintiffs' contention that the 3,700–acre tract of wetlands has little value.

In a letter to the Corps dated February 5, 1975, the Fish and Wildlife Service of the Department of Interior repudiated its early 1960's statement that these wetlands were of low value: "Fish and wildlife resources within these wetlands are presently of high value . . . . We must recommend that no further construction be performed and that the Bayou Aux Carpes pumping station not be installed."

The EPA conducted a study in March, 1976 and found the 3,700–acre tract was predominately a freshwater system of mainly swamp and some marsh which is part of the Barataria Bay drainage basin which is characterized by a specific salinity gradient. This salinity regime is an important factor in the continued production of

estuarine dependent species such as the commercial fish and shellfish harvested in the Barataria Bay area. The report stated: "Estuaries owe their high productivity largely to the extensive systems of marshes and swamps at the land–water interface and to the broad brackish zones where salinity fluctuations are tempered by continuous freshwater inputs from interior storage areas."

The annual rainfall in the area is approximately sixty (60) inches. The report states that with the construction of the Bayou Aux Carpes pumping station the rainfall will be removed from the drainage basin at a rate five times greater than the natural system which will disrupt the salinity regime and consequently the estuary system.

The report also states that the tract produces an organic matter which supports an indigenous fauna the surpluses of which are exported through the pipeline canal to fuel downstream systems. This tract also supports flora and fauna which are of direct value to man for recreation, fishing, aesthetics and timber production.

■ The record supports a finding that the wetlands herein are environmentally important and it is in the public interest to preserve them if there is an acceptable alternative.

The plan set out in the Wilson order *is* such an alternative. The placement of the movable floodgates at Bayou Aux Carpes and Bayou Des Familles will allow for the normal interchange of waters through the system during normal periods and in the event of a hurricane or high tidal condition the gates would be lifted to prevent flooding.

Plaintiffs are arguing that the Project does not provide any flood benefits because there is some impoundment of water behind the levees following heavy rainfall in the area. Plaintiffs are relying on evidence received in state court proceedings wherein it was stated that if the floodgates were raised to a certain level and certain weather and tidal conditions existed, there would be impoundment of water behind the levees.

■ However, the plaintiffs must acknowledge that if the floodgates are not fully extended there will be drainage of the area through Bayou Aux Carpes and Bayou Des Familles as well as through the pipeline canal opening. General Wilson acknowledged that some impoundment of waters behind the levees may occur but did not find that such occurrence justified the destruction of the wetland area. We do not believe that in executing a flood control plan the Corps is required to eradicate every possible flood and drainage problem in the vicinity. *United States v. Sponenbarger, supra.* Though there may be some remaining drainage problems, we find that General Wilson did not abuse his discretion in adopting the alternative plan.

The November 16, 1976 order was *not* a total abandonment of the Project. The levee system and floodgates provide hurricane and flood protection from the adjacent water bodies as was envisioned in the original plan.

■ We find that the Wilson order merely reflects a decision of the Corps to *modify* the Project so as to bring it into conformity with the existing environmental regulations. This action did not result in the abandonment of all flood control benefits but merely resulted in the elimination of the land reclamation aspects of the Project.

## CONSTITUTIONAL OBJECTIONS

Plaintiffs argue they will suffer a deprivation of property rights because, if the Wilson order is implemented, their land will remain in a wetland state and they will be unable to develop it for industrial and residential purposes.

■ It is well established that where the United States exercises its superior right, pursuant to its power under the commerce clause, which results in the frustration of an individual property owner's business opportunity or enterprise, such action does not constitute a taking of property within the meaning of the Fifth Amendment. *United States v. Grand River Au-*

thority, 363 U.S. 229, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960); *Omnia Commercial Company v. United States*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923); *United States v. Chandler–Dunbar*, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); *South Terminal Corp. v. EPA*, 504 F.2d 646 (CA1–1974).

Plaintiffs contend that they are being deprived of contractual rights due to them as the result of the servitudes they granted to the Parish and also as third party beneficiaries of the contracts and assurances of cooperation between the Parish and the Corps.

As pointed out above, the plaintiffs have no right of action under the acts of assurances given by the Parish. *Akers v. Resor, supra.*

With regard to any contractual rights plaintiffs may have pursuant to the Tucker Act, the Court of Claims has jurisdiction upon an express or implied contract with the United States. 28 U.S.C. § 1491. Plaintiffs' sole remedy, if any, is money damages. They are not entitled to specific performance from the United States. *American Science and Engineering, Inc. v. Califano*, 571 F.2d 58 (CA1–1978); *Alabama Rural Fire Insurance Co. v. Naylor*, 530 F.2d 1221 (CA5–1976).

Plaintiffs contend they were denied procedural due process. Plaintiffs were given an opportunity to present their viewpoints at the January, 1975 hearing and also were allowed to send in written comments to the Corps. Several of the plaintiff property owners also accompanied General Wilson when he visited the site in October, 1976. General Wilson was well aware of their position on the Project. Thus we hold that plaintiffs' right to procedural due process was not violated.

We also find that the Wilson decision was supported by the administrative record and that plaintiffs were afforded substantive due process.

**EFFECT OF STATE COURT DECISION**

Plaintiffs rely on the findings in the state court proceeding of *Jacques Creppel et al. v. The Parish of Jefferson et al., supra*, in which the Parish was ordered to proceed with the construction of the pumping station.

This Court is not bound by that state court decision in interpreting the federal statutes involved herein. The activities of a federal official or agency which are in accord with Congressional authority are protected by the Supremacy Clause of the United States Constitution, Article VI, clause 2, from interference by state regulation or control. *McCullough v. Maryland*, 17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579 (1816); *Southern Pacific Co. v. Olympian Dredging Co.*, 260 U.S. 205, 43 S.Ct. 26, 67 L.Ed. 213 (1922); *Iowa Public Service Co. v. Iowa State Commerce Com'n*, 407 F.2d 916 (CA8–1969).

For the foregoing reasons, judgment will be entered in favor of the defendant United States of America and against the plaintiffs dismissing their suit at their cost.